IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHARLES T. HUDGINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:04cv0915** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Charles T. Hudgins filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. Before the Court is Plaintiff's motion for judgment on the administrative record and accompanying memorandum (Doc. Nos. 9 and 10), to which Defendant, the Commissioner of Social Security, has responded (Doc. No. 17) Plaintiff has filed a reply brief (Doc. No. 20).

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination at step four of the sequential analysis that Plaintiff is able to perform his past relevant work is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g). Plaintiff's Motion will therefore be denied and the Commissioner's determination affirmed.

**I. INTRODUCTION**

Plaintiff filed an application for DIB dated October 2, 2001 alleging disability beginning on July 1, 2000. (Administrative Record (Doc. No. 5, Attachment) (hereafter "AR") 46-48.) Plaintiff was found not disabled within the meaning of the Act in a decision dated January 31, 2002 (AR 20-21). Plaintiff filed a request for reconsideration on April 3, 2002, citing worsening back pain, elevated cholesterol requiring him to begin taking cholesterol medication, and the added stress of filing an appeal. (AR 28, 97-100.)

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

Upon reconsideration, the Agency again found that Plaintiff was not disabled in a decision dated August 3, 2002 (AR 22-23), and Plaintiff received a notice of reconsideration informing him of the denial of his claim for DIB dated September 1, 2002. (AR 30-31.) Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ") on September 13, 2002. (AR 32-33.) A hearing was held on February 18, 2004. (AR 38-45, 339-56.) Plaintiff received notice of an unfavorable decision May 24, 2004 (AR 9-11, 12-18). Plaintiff filed a request for review of the hearing decision on June 3, 2004 (AR 7). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on August 11, 2004. (AR 4-6.) Plaintiff now requests judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.   BACKGROUND

Plaintiff was born on July 27, 1957 and was forty-two years old on July 1, 2000, the date of the alleged onset of disability. (AR 46.) Plaintiff attended school through the ninth grade and later earned a GED. (AR 342.) Plaintiff was in the United States Air Force from 1979 until 1986, when he received an honorable discharge for medical reasons. (AR 343.) After his discharge from the Air Force, Plaintiff held several jobs. Plaintiff's work history includes five years as a service advisor for an auto repair business, more than four years as a service representative at Bell South, and stints working in commercial painting, as a handyman and as a security guard. Finally, after his alleged disability onset date of July 1, 2000, he worked for several months for the Census Bureau doing follow-up surveys. That employment ended by April 24, 2001. (AR 343-45.)

### A.   Chronological Background:  Procedural Developments and Medical Records

During his time in the Air Force, Plaintiff experienced a series of medical problems that the Air Force ultimately deemed to be, by its standards, disabling. Once discharged from the Air Force, Plaintiff continued to be treated by the Veteran's Administration ("VA") through its medical personnel and facilities.

The VA produced a Compensation and Pension Exam Report dated November 26, 1997, subsequent to an examination performed November 22, 1997.[2]  (AR 142.)  At the time of that

---

[2] Although this examination and report were prepared well before the alleged onset date and by an agency other than the Social Security Administration, the information is included here both because it

examination, Plaintiff had quit his job with Bell South of over four years due to excessive absences allegedly caused by headaches as well as pain in his neck and shoulders. Plaintiff reported chronic neck pain stemming from a neck injury received in a motorcycle accident in 1982. He also reported that in 1986, he was hospitalized and treated for chronic neck strain for a period of four months with daily traction and physical therapy. At the time of the November 1997 examination, Plaintiff continued to allege chronic pain, muscle spasms, and tension headaches generated by his chronic neck pain. (AR 142.) Plaintiff claimed he had daily tension headaches that prevented him from functioning at all ten to twelve days per month. (AR 143.) Plaintiff also suffered a broken scapula during the motorcycle accident and continued to allege chronic shoulder pain through the date of the November 1997 exam. Plaintiff reported straining his back several times while in the military and alleged "flares" occurring one to two times per month during which his back pain would radiate down his right leg and into his foot and cause "difficulty in functioning." (AR 142-43.) Plaintiff was taking Valium twice daily and as needed for muscle spasms, and ibuprofen as needed for headache and other pain. (AR 143.)

The physical exam in 1997 revealed "obvious muscle spasm" in Plaintiff's right trapezius muscle, mild tenderness of the neck and shoulder, and limited range of motion of the neck, right shoulder, and lumbar spine. (AR 143.) The impressions at that time were of chronic neck pain, arthritis and decreased range of motion in the right shoulder, lower back pain with occasional sciatica, and tension headaches secondary to chronic muscle spasm of the neck. (AR 144.) The examination report concluded that "[t]hese problems impair [Plaintiff's] function on a daily basis and apparently make it difficult for him to be able to function consistently on a daily basis." (AR 144.)

The VA issued the following "rated disabilities," all of which it deemed to be service-connected:

| | |
|---|---|
| Traumatic Arthritis | 60% |
| Traumatic Arthritis | 40% |
| Shoulder Condition | 10% |
| Migraine Headaches | 0% |
| Degenerative Arthritis | 0% |
| Facial Scars | 0% |

(AR 145.) Under the VA's system for evaluating total disability, these assessments resulted in a 90% disability rating. (AR 140.)

---

is potentially relevant to Plaintiff's medical history and because Plaintiff attempts to rely upon the Air Force's disability determination to obtain Social Security benefits in the instant case.

On July 13, 2000, the VA reconsidered its previous finding that Plaintiff was 90% disabled. (AR 137-39.) Plaintiff's low back pain, previously found to be 40% disabling, was decreased to 20% disabling effective January 8, 2000, the date of a VA exam. (AR 137, 139.) The VA exam findings did not show that Plaintiff had a sufficiently severe impairment to qualify him for the 40% rating. Instead, he was found to have slight to moderate limitation of motion of the lumbar spine and some muscle weakness, but no evidence of muscle spasm, edema or other objective symptoms. (AR 139.) Plaintiff's overall service-connected evaluation, however, remained at 90% under the VA's method of calculating overall disability, and previous evaluations of disabilities relating to his cervical spine and tension headaches were continued. (AR 137.)

During early 2000,[3] Plaintiff tried various medications to lower his high blood pressure and frequently called or presented himself to the Veterans' Administration Medical Center ("VAMC") to complain of side effects related to these medications. (AR 186-89.) On March 22, 2000, Plaintiff was issued a blood pressure cuff to monitor his high blood pressure from home. (AR 187.) Plaintiff underwent an echocardiogram on October 19, 2000, the results of which were normal. (AR 184-86.)

On February 15, 2001, Plaintiff received a physical exam during which longstanding hypertension was noted. (AR 184.) Intolerance of various types of blood pressure medications was noted, including Verapamil, Propranolol, Atenolol, and Lisinopril. Amlodipine was suggested as a replacement with the *caveat* that Plaintiff "looks up all his medicines on the internet and may be suggestive to some of the side effects." (AR 184.) Plaintiff reported worsening back pain and was prescribed Tylenol #3. Plaintiff was encouraged to quit smoking and instructed to report back in three months. (AR 184.)

On May 1, 2001, Plaintiff complained of a "terrible headache." (AR 184.) On May 11, 2001, Plaintiff presented reporting he had had a frontal headache daily for about one week. (AR 183.) History of sinus troubles was noted, and medication was prescribed based on the assumption that he had a sinus headache. Hypertension was noted, though Plaintiff was tolerating the Amlodipine. Plaintiff complained of back pain and intolerance of both Tylenol #3 and Darvocet. Atherosclerosis of the abdominal aorta

---

[3] The Court's description of the medical records provided by the VAMC begins with the year 2000 due to Plaintiff's onset date as well as considerations of relevance and economy; the Administrative Record contains patient notes for Plaintiff dating as far back as 1991. (AR 136-273.)

was noted.  He was prescribed Lortab for breakthrough back pain and asked to return in three months. (AR 183-84.)

On August 31, 2001, Plaintiff presented complaining of bilateral ankle pain with swelling for three to four months.  He also reported worsening neck pain and intermittent numbness in his right fingers.  (AR 182.)

On September 11, 2001, Plaintiff was seen in the primary care clinic claiming he had discovered a mass in the side of his neck.  A CT scan was negative for masses but showed C-spine degeneration. Plaintiff also complained of lower back and neck pain.  (AR 178.)  He was also treated for a cerumen (ear wax) impaction around this time.[4]  (AR 177-81.)

On September 22, 2001, Plaintiff presented for evaluation of his headaches and pain in his joints and spine.  He reported chronic lower back, cervical and thoracic pain, discomfort, muscle tightness, soreness, and decreased flexibility.  His medications included Motrin, Valium and Claritin, which he reported provided some moderate relief.  (AR 175.)  He also complained of left knee pain with a history of pseudogout, a form of arthritis.  (AR 175-76.)

On examination, the VA doctor noted that Plaintiff "jumped" upon palpitation of his entire spine but that it was unclear whether this was due to tenderness.  (AR 176.)  The doctor also noted that despite limited rotation of the cervical spine during the examination, during the interview, Plaintiff was able to rotate his head "much more than" during the examination.  Plaintiff had a full range of motion in both knees.  Review of previous films of the lumbosacral region and left knee were normal.  (AR 176, 211.) Films of the cervical spine showed moderate disc space disease.  (AR 176.)

The doctor diagnosed chronic back pain, moderate disc space disease of the cervical spine, left knee pain secondary to pseudogout, chronic headaches, and "significant pain and dysfunction that may impair [Plaintiff's] employability."  However, the doctor went on to note that "there is no objective evidence to explain such severe disability that he claims."  (AR 176.)

Plaintiff presented on October 10, 2001 complaining of multiple types of headaches:  "stress" headaches since 1985; headaches that began with neck and right-side occipital pain beginning in 1985

---

[4] Plaintiff experienced chronic problems with ear wax and was frequently treated for impactions and build up.

and worsening lately; and headaches beginning in 1995 that occur above his eyes and sometimes occur after the neck-related headache, sometimes accompanied by visual disturbances. (AR 172.) Plaintiff stated that in the previous two months, the longest he had gone without experiencing any headaches was one week, and he had endured headaches that lasted as long as three or four days. (AR 173.) Sometimes the headaches were so severe that he had to lie down and could not do anything else. Plaintiff also complained of numbness and tingling in his hands which woke him up and caused poor sleep. Plaintiff complained of chronic back pain and foot cramps. The physician's impressions on this visit included diagnosis of migraine headaches which were "infrequent and unlikely to be substantially disabling on a persistent basis." He stated that Plaintiff's current source of disability was carpal tunnel syndrome, which affected his mobility and interfered with sleep. The physician noted chronic neck strain and cervicalgia, mild carpal tunnel syndrome, and chronic lumbar spondylosis. The doctor prescribed a wrist splint. (AR 173.)

On October 19, 2001, Plaintiff presented with a headache only slightly relieved by hydrocodone. He rated his pain at 10 on a scale of 1 through 10 and said it was the worst migraine he had ever had. He was referred to emergency. (AR 170-71, 211.) A CT scan revealed mild to moderate cerebral and cerebellar atrophy, "atypical for [Plaintiff's] age," but no other remarkable findings other than fluid in the sinus cavity indicating sinusitis. (AR 211.)

Dr. Nancy Kahn performed an examination on behalf of the SSA in connection with Plaintiff's application for benefits on January 1, 2002. (AR 122-25.) Dr. Kahn listed Plaintiff's claimed impairments as "neck and back injuries, traumatic arthritis, migraines, high blood pressure, heart, angina, stomach." (AR 122.) Dr. Kahn took a medical history that documented Plaintiff's involvement in a motor-vehicle accident in 1982 that resulted in cervical strain and corresponding neck symptoms, which initially resolved but then returned in 1984 and continued until the date of examination. Plaintiff also reported having been involved in motorcycle accidents in 1983 and 1984, resulting in additional injuries. In 1985, Plaintiff underwent three months of physical therapy and traction on his neck. Plaintiff also reported suffering low-back pain throughout this time. Dr. Kahn noted that Plaintiff's spinal problems had been diagnosed as a combination of degenerative and traumatic arthritis. Since 1996, Plaintiff reported having problems with

his hips and knees as well, and asserted that his symptoms worsen with standing, bending and weather. (AR 122.)

Plaintiff told Dr. Kahn that his headaches began in 1985.  He reported experiencing headaches at least three times per week that last several hours.  He described having "regular" migraines with auras and light sensitivity, as well as headaches relating to his neck and back pain.  He treated them with Motrin and rest.  (AR 122.)

Plaintiff told Dr. Kahn that he had experienced problems with high blood pressure, sometimes controlled by medication, since 1998.  (AR 122.)  Also since 1998, he experienced chest pain one or two times per week for up to twenty minutes, with no known cause or cardiac implications.  (AR 123.)  Plaintiff also complained of stomach pain beginning in 1995 that was controlled by medication.  Dr. Kahn's report indicated a recent diagnosis of carpal tunnel syndrome with nocturnal hand pain, insomnia, chest pain, and shortness of breath.  Plaintiff reported smoking one and half packs of cigarettes per day and drinking occasionally.  (AR 123.)  Plaintiff had no teeth at the time of examination but claimed to have dentures at home.   (AR 124.)   Plaintiff was currently taking hydrocodone, ibuprofen, Valium, Ranitidine (for stomach/ulcer), and Lodine (arthritis).  (AR 123.)

Plaintiff exhibited limited range of motion in his neck, decreased shoulder abduction, and mildly decreased of range of motion of the lower extremities and spine.  (AR 124.)  Dr. Kahn concluded that Plaintiff would be able to sit, stand, or walk six hours in an eight hour day; and to lift five to ten pounds routinely and ten to fifteen pounds episodically, but would have problems with overhead lifting.  (AR 125.)

The VA records provided for Plaintiff reveal that he has a history of poor dentition, poor oral hygiene, advanced periodontal disease, advanced dental caries and mobility in his remaining teeth.  (AR 172.)  Plaintiff had multiple tooth extractions performed on January 3, 2002, and he was later fitted for dentures.  (AR 164-65, 156-59.)

On January 7, 2002, Plaintiff underwent a lumbar procedure upon referral from Dr. Kahn that revealed mild disc space narrowing at L4-5.  The report, prepared by Dr. James King, also noted aortoiliac atherosclerosis.  (AR 126.)

On January 24, 2002, a DDS physician[5] completed a Residual Functional Capacity ("RFC") assessment.  (AR 128-35.)  That assessment indicated Plaintiff could occasionally lift/carry a maximum of twenty pounds, and frequently left/carry up to ten pounds and could stand/walk for about six hours in an eight-hour day; overhead pushing, pulling and reaching were limited in both upper extremities but no other manipulative limitations were indicated.  (AR 129, 131.)  No postural limitations were indicated.  (AR 130.)  There were no visual, environmental, or communicative limitations.  (AR 131-32.)  The examiner observed that Plaintiff's medical records showed that some treating/examining sources had reached findings significantly different from the examiner's findings.  The examiner felt these discrepancies were explained by the fact that Plaintiff had a greater range of motion in his neck when he was indirectly observed than when he was directly examined, which suggested malingering, and no radicular findings.  Other explanations provided by the examiner are either written in shorthand or illegible.  (AR 134.)  The examiner clearly took issue with Plaintiff's treatment and diagnosis records, noting in one place on the RFC form:  "[illegible] does not document chronic/persistent/severe [illegible] . . . .  This is nonsense." (AR 130.)

On February 19, 2002, Plaintiff presented at the walk-in clinic complaining of side effects from Felodipine, yet another blood pressure medication.  He was advised to discontinue the medication for three or four days to see if his symptoms resolved and encouraged to stop smoking and lose ten to fifteen pounds, which could eliminate the need for any pharmacologic hypertension treatment.  (AR 160.)

Plaintiff was seen at the VA hospital again on March 19, 2002.  His medical problems at that time included pseudogout of the left knee that produced stable pain managed by Motrin and occasionally Lortab.  Plaintiff experienced elevated blood pressure and problems taking blood pressure medications, but at the time of this visit he was attempting to lose weight to obviate the need for medication.  Plaintiff complained of back pain and reported taking Valium for muscle spasms and anxiety.  Plaintiff also had high cholesterol, cystic acne, and carpal-tunnel syndrome with stable symptoms.  (AR 153.)  He reported having no current problem with migraine or sinus headaches.  (AR 154.)  He continued to be prescribed

---

[5] The doctor's signature and name stamp on this RFC assessment are both illegible (though the physician's first name appears to be "Celia"), and the Court was unable to find any other reference to the author of this assessment contained in other parts of the record.

Motrin and Lortab for his knee, was referred to a dermatologist for a lesion on his hand and cystic acne, restarted on cholesterol medication, and scheduled to return for a follow up in three months. (AR 154.)

Plaintiff presented on April 15, 2002 complaining of low- and mid-back pain. He complained that it was worse with lifting but also kept him awake at night. The VA doctor reviewed Plaintiff's previous CT scans, lumbar film, and thoracic films. He noted atherosclerosis in the abdominal aorta, protrusions of the cartilage at T12 and L1, apparent as early as 1997, but no disc bulges, good disc space height and no evidence of spondylolisthesis in the most recent lumbar film, which was taken in January 2000. (AR 149.) The doctor recommended a topical analgesic, Motrin, Lortab, and Flexeril as needed, with a possible TENS unit if other medications provided insufficient relief. Plaintiff deferred beginning blood pressure medication until his appointment in June. (AR 150.)

Plaintiff presented in the ER on June 15, 2002, complaining of exacerbation of chronic left shoulder pain, partially relieved by Motrin. (AR 317.) X-rays of the left shoulder showed a minor abnormality, namely "some calcification in the region of the left C-C ligaments, suggesting a previously reduced left AC separation." Otherwise, the joint appeared normal. Plaintiff was continued on Lortab for breakthrough pain and advised to follow up. (AR 325.)

Ten days later, on June 25, 2002, Plaintiff was seen in the VA clinic. Plaintiff reported that his knee pain and carpal-tunnel symptoms were stable (AR 313-14); he stated he had no current problems with headaches, migraines or his sinuses but complained of back pain.[6] (AR 314.) Plaintiff reported some improvements in his left shoulder pain, but claimed the pain was exacerbated when he slept on his left side. (AR 315.)

On August 29, 2002, Dr. Glenda Knox-Carter, medical consultant, filled out a Physical RFC Assessment. (AR 274-79.) She found that Plaintiff could lift/carry up to twenty pounds occasionally and ten pounds frequently. She assessed that he could stand, walk, and sit with normal breaks about six

---

[6] Plaintiff kept a "headache diary" from May 2002 until December 2002. The diary consists of calendar pages annotated with an "H" (headache), "IH" (intense headache), or "OH" (ocular headache) on the days that Plaintiff says he experienced a headache. (AR 113-21.) Plaintiff noted headaches on June 1,2, 8, 10, 11, 16, 17, 21, 25, 26, 27, and 30. (AR 115.) Despite this record, when Plaintiff was seen at the VA on June 25, 2002, he reported having no problems with headaches, even though his headache diary indicates that he had experienced headaches on eight separate days already that month and actually noted a headache on the day of his appointment. (AR 115.)

hours in an eight-hour work day.  She limited pulling in his upper extremities to occasionally for overhead work only.  (AR 275.)  She noted no postural limitations (AR 276) and, while indicating overhead reaching was limited, noted that Plaintiff's abilities in the areas of handling, fingering, and feeling were unlimited. No visual, communicative or environmental limitations were noted.  (AR 277.)  She found Plaintiff's allegations of pain to be "partially credible."  (AR 278.)

Plaintiff was seen at the walk-in clinic at the VA on October 4, 2002 complaining of dizziness, lightheadedness and a shaky sensation for one week, with insomnia for the past month.  (AR 299.) Plaintiff reported losing several friends during the past year and having financial difficulties.  Doctors suggested that he see a social worker.  (AR 300.)  A few days later, on October 8, 2002, Plaintiff reported that he began taking Paxil, an anti-depressant/anti-anxiety drug, the previous evening.  The Paxil made him tense and unable to sleep, and he felt his heart thumping throughout the night and had constant pain in his left upper chest.  (AR 296.)  VA doctors switched him to Buspar, another anti-anxiety drug, and prescribed a different sleep aid.  A referral to the mental health clinic was recommended.  (AR 297.)

Plaintiff underwent a cardiovascular stress test on January 3, 2003.  Plaintiff demonstrated "excellent exercise capacity; normal hemodynamic response to exercise," and he achieved his target heart rate without experiencing chest pain, arrhythmias or other abnormalities.  (AR 323.)

On May 18, 2003, Plaintiff had radiographs taken of his thoracic spine.  The radiologist reading the exams noted no abnormalities; the impression was normal alignment and well-maintained disc spaces.  (AR 319.)  CT scans of his abdomen, pelvis and thorax on this same date likewise yielded normal results.  (AR 320-21.)  However, two chest views revealed that Plaintiff's heart was at the upper limits of normal, but stable.  The radiologist noted a "major abnormality," but stated that no attention was needed.  (AR 322.)

Plaintiff was seen for a routine follow up on May 27, 2003.  He had been refusing to take his blood pressure medication and his blood pressure was up.  He reported panic attacks every one to two weeks with difficulty sleeping at night.  (AR 335.)  He did not report problems with headaches.  (AR 336.) The VA physician thought he had "talked [Plaintiff] into" taking a cholesterol drug and restarting his blood-pressure medication.  (AR 337-38.)  The doctor noted Plaintiff's previous addiction to "benzos"

(presumably benzodiazepines) and indicated he would continue Plaintiff on small doses of Valium only. (AR 338.)

Plaintiff presented again on September 23, 2003, this time complaining of intermittent left upper-leg pain, potentially caused by driving a stick shift.  (AR 331-32.)  He additionally complained of blurry vision at the grocery store and worsening chest and back pain.  (AR 332.)  Once again, Plaintiff did not report having migraine, sinus, or carpal tunnel problems at the time of this visit.  (AR 333.)  He was continued on Valium and the one medication for hypertension that he appeared able to tolerate.  (AR 334.)

On January 13, 2004, Plaintiff reported complaining of worsening pain in his right upper back and under his right arm.  He also complained of swelling in his ankles (perhaps due to increased sodium intake), wax in his ears, and a swollen right second toe.  (AR 327.)  The examining physician noted the plethora of blood pressure medications that Plaintiff had tried and rejected due to various alleged side effects.  He noted, "[i]t is hard to believe all of these complaints are well founded but he refuses to try any of these new meds again."  (AR 328.)  Carpal tunnel and headache symptoms were stable, and Plaintiff reported sleeping better at night with Restoril.  Under the heading of anxiety/depression and in the context of discussing Plaintiff's refusal to try other sleep aids, the physician stated, "I believe this is his main problem and exacerbates most of his medical problems."  (AR 328.)  He also observed that Plaintiff "has found a reason to stop almost every new medication I start and therefore his medical problems have been difficult to control."  (AR 328.)  The physician continued Plaintiff on Valium for anxiety and advised a follow-up in approximately three months.  (AR 328-29.)

**B.      Hearing Testimony**

ALJ John P. Garner heard Plaintiff's case in Nashville, Tennessee on February 18, 2004.  (AR 339.)  Plaintiff was present and represented by attorney Andrew Reichardt.  (AR 341.)  A vocational expert ("VE"), Robert Bradley, also testified.  (AR 341.)

Plaintiff's attorney set out Plaintiff's complaints:  back and neck pain, headaches ("several a week"), left knee pain, anxiety and depression.  (AR 341-42.)  Plaintiff testified that he was forty-six years old at the time of the hearing.  (AR 342.)  He attended school through the ninth grade and then earned a GED.  He also attempted vocational rehabilitation through the VA but stopped going to school due to back

pain.  (AR 342-43.)  Plaintiff testified that he served in the Air Force from 1979 through 1986 and was discharged for medical reasons.  He was last employed by the Census Bureau in April 2001.  He had worked for the Census Bureau part time, a few hours a week, and this was his only employment since his alleged onset date of July 1, 2000.  (AR 343.)  Plaintiff listed his other post-Air Force employment (in reverse chronological order) as including painting, furniture refinishing, and working as a security guard, handyman, and telecommunication service representative.  (AR 344.)  Prior to this work, he had been a service advisor for an auto-repair business for five years.  (AR 345.)

Plaintiff testified that he could not work at the time of the hearing due to his "back pain, headaches, blood pressure issues, the anxiety issues that have really just arisen over the last year or so." Plaintiff continued, "I would say mainly my back pains and the feeling that I have, possibly I'm having heart pains."  (AR 345.)  Plaintiff stated that he has constant pain in the "thoracic" area of his back which causes him to limit his activities.  (AR 346.)  He testified that he took ibuprofen, tried to relax, and used heat and ice packs for the pain.  He sometimes took hydrocodone.  Plaintiff further described having to lie down at least once every day for about an hour because of the pain, and stated he had difficulty sleeping at night.  (AR 346-47.)  Plaintiff described his left knee problem as involving occasional swelling and stiffness due to pseudogout.  (AR 347.)  Plaintiff alleged he previously had to have fluid drained from his knee on more than one occasion, the last of which was a year or more before the hearing.  (AR 347-48.) Additionally, Plaintiff believed that he was experiencing pseudogout in his right foot.  He testified that he had trouble standing in line at the grocery store or at the DMV because it caused low back, hip, and testicle pain.  (AR 348.)  However, he added, "[a]s long as I'm moving around, I guess I'm okay," but that he could only stand in one place for "maybe 15 minutes."  (AR 348-49.)  Sitting too long caused lower-back pain, but Plaintiff said he was all right as long as he could get up and move around a bit occasionally.  He estimated that he could sit for about an hour and that he could lift a maximum of fifteen pounds (the weight of his dog).  (AR 349.)

During his hearing testimony, Plaintiff stated that he had a headache at that moment, probably stress-induced due to nervousness.  He testified that he had headaches two to three times a week for a couple hours to a day or more each.  Plaintiff believed that the headaches could be triggered by reflected

light, certain smells, and stress. He testified that he takes Motrin or hydrocodone for his headaches. (AR 350.)

Plaintiff described his anxiety as stemming from the deaths of several good friends in a relatively short time period. (AR 350.) He stated that there was a three- or four-month period where he had panic attacks and "it was really, really bad," but that it had improved. He described having a feeling of "impending doom" accompanied by trouble breathing and chest pain one to two times a week for up to ten minutes. He stated that he took Valium if the symptoms lasted more than thirty minutes. (AR 351.)

Plaintiff described having trouble waking up in the morning, possibly due to a past blow to his head. (AR 351.) He described a typical day as beginning with drinking six cups of coffee and letting his dogs out. (AR 352.) He typically watched the news and usually went out for lunch. He read, watched TV, occasionally used his computer, maybe visited a friend. He described doing light chores around his house, including vacuuming and putting dishes in the dishwasher. (AR 352-53.) He testified that he attended church. (AR 353.) The side effects of his medications included drowsiness, upset stomach, and an over-all tired feeling. (AR 353-54.) He indicated difficulty tolerating some of his prior medications. (AR 354.)

The VE also testified. He began by characterizing Plaintiff's past work. The first job, office supervisor survey worker, was light and skilled. The security job was light and semi-skilled. The job of painter was medium and skilled. Furniture repair involved medium and skilled work. Service representative for a telecommunications company was sedentary and skilled, and service writer was light and skilled. (AR 354.)

The ALJ described Exhibit 4F,[7] the RFC assessment completed August 29, 2002, by Dr. Glenda Knox-Carter, as depicting an individual capable of light work limited in the upper extremities to occasional overhead use, capable of frequent postural activities but limited reaching. The ALJ asked the VE if these limitations would allow the performance of the light work Plaintiff did in the past. (AR 354-55.) The VE responded affirmatively.

---

[7] The hearing transcript refers to this exhibit number as "4FD," which is apparently a typographical error. Exhibit 4FD does not exist, nor are exhibits typically named by using one number and two letters. Here, the reference to Exhibit "4FD" is clearly to Exhibit 4F, the RFC assessment completed by DDS physician Dr. Glenda Knox-Carter, dated August 29, 2002. (AR 274-79.)

The ALJ summarized Nancy Conn's consultative exam, performed in January 2002, as describing a person capable of sitting six hours in an eight-hour day; standing or walking six hours in an eight hour day; lifting five to ten pounds routinely and ten to fifteen occasionally; and having difficulty with overhead lifting. The VE opined that these limitations would also allow the light jobs that Plaintiff had done in the past. The VE agreed, however, with the ALJ's observation that if Plaintiff's testimony was credited regarding the limitations he experienced in standing, walking and sitting due to back pain, the difficulties with the headache pain and fatigue, and the necessity of lying down at least once during the day, sustained work activity would be difficult. (AR 355.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on May 24, 2004. (AR 12-18.) Based on the record, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since July 1, 2000.

3. The claimant has the following severe impairments: degenerative disc disease and arthritis.

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit for a total of about 6 hours in an 8 hour day; stand and/or walk for a total of about 6 hours in an 8 hour day; occasionally reach overhead with bilateral upper extremities; frequently climb, balance, stoop, kneel, crouch, crawl, push, or pull. The claimant retains the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting.

7. The claimant is able to perform his past relevant work as an office supervisor, security guard, auto service writer, and telephone service representative.

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

(AR 17.) On June 3, 2004, Plaintiff requested review of the ALJ's decision. (AR 7-8.) On August 11, 2004, the Appeals Council denied Plaintiff's request for review. (AR 4-6.)

IV.     DISCUSSION

A.      Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (adopting and defining substantial-evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g.*, *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g.*, *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g.*, *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the claimant, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the claimant must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Heston*, 245 F.3d at 534 (citing *Abbott*, 905 F.2d at 923; 20 C.F.R. §§ 404.1520(b) and 416.920(b)). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or

mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)(2000)). Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled. *Heston*, 245 F3d at 534.

Once the claimant establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the claimant can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g.*, *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs the claimant can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (6th Cir. 1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the claimant's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that he can perform, he is not disabled. *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B.     The Five-Step Inquiry**

In this case, the ALJ resolved Plaintiff's case at step four of the five-step inquiry. (AR 16.) At step one, the ALJ found that Plaintiff successfully demonstrated that he had not engaged in substantial

gainful activity since the alleged onset date of disability of July 1, 2000.[9]  (AR 12.)  At step two, the ALJ found that Plaintiff suffered from the severe impairments of degenerative disc disease and arthritis.  The ALJ also noted Plaintiff's impairments of pseudogout of the left knee, carpal tunnel syndrome, headaches and anxiety/depression, but he found none of these impairments individually or in combination to be severe within the meaning of the Act.  (AR 13.)  At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (AR 17, 16.)

At step four, the ALJ examined Plaintiff's ability to do his past relevant work.  (AR 16.)  The ALJ found that Plaintiff retained the RFC to perform light work activity.  At the hearing, the VE described several of Plaintiff's past relevant jobs as constituting work at the light level and classified these jobs as work that Plaintiff could still perform.  Based on the administrative record as a whole, as well as the testimony of the VE, the ALJ found that Plaintiff could perform his past relevant work as an office supervisor, security guard, auto service writer, and telephone service representative.  Since the claim was resolved at step four, the ALJ did not go on to step five.

C.       **Plaintiff's Assertions of Error**

1.       *The ALJ did not err in evaluating Plaintiff's credibility.*

Plaintiff alleges that the ALJ failed to state clearly his reasons for finding that Plaintiff's allegations regarding his limitations were not totally credible.  Plaintiff takes issue with the ALJ's use of the reference to "reasons set forth in the body of the decision" at the conclusion of the May 2004 decision as insufficient to support his credibility finding.  (AR 17.)  Regardless of whether Plaintiff objects to the ALJ's failure to set forth more reasons in the ALJ's summary of his findings or instead takes issue with the analysis as presented within the body of the decision, the Court finds that the ALJ properly analyzed Plaintiff's credibility.

The ALJ is charged with evaluating the credibility of a claimant at the hearing, and the ultimate decision as to credibility rests with the ALJ.  The ALJ's credibility finding is entitled to deference "because

---

[9] Plaintiff was employed by the Census Bureau after his alleged onset date, but his earnings were so insignificant ($1,670.50 for the year 2001) that the ALJ found that this employment did not amount to substantial gainful activity.  (AR 12.)

of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F.Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036). Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record and should not be based upon the "intangible or intuitive notion[s]" of the ALJ. SSR 96-7p, 1996 WL 374186, *4 (July 12, 1996). If a claimant's complaints with respect to symptoms are not supported by objective medical evidence, the ALJ must make a determination based on consideration of the record as a whole, including lab findings, the claimant's complaints, information provided by treating physicians and other relevant evidence. The ALJ must explain his credibility determination such that both the claimant and subsequent reviewers would know the weight given to the claimant's statements and the reasons for that weight. *Id.*

Both the Social Security Administration and the Sixth Circuit have enunciated guidelines for analyzing a claimant's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit set forth the basic standard for evaluating such claims in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986).[10] The first prong of the *Duncan* test is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two components: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

Here, the ALJ discussed the objective medical evidence of record and engaged in an analysis of Plaintiff's subjective complaints, including those of pain. The ALJ noted a September 22, 2001 statement

---

[10] Although *Duncan* purportedly only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

by a VA doctor that there was "no objective evidence to explain such severe disability as [Plaintiff] claims." (AR 14-15.) The ALJ also collected and documented various inconsistencies with respect to Plaintiff's allegations regarding his headaches. Despite an allegedly long history of headaches, as well as statements by Plaintiff regarding the frequency and severity of these headaches, the ALJ noted that there was little evidence of such a severe headache problem in the medical history. (AR 15, collecting specific incidents.) Perhaps most significantly with respect to headaches, the ALJ pointed out that during the time Plaintiff kept his "headache diary," and reported disabling headaches two to three times per week, each lasting from two to twenty-four hours, Plaintiff was seen at the VA and reported no problems due to headaches. His headache diary, by contrast, purported to document eight headaches that month leading up to his appointment as well as one on the day of the appointment. The ALJ also noted that Plaintiff reported experiencing severe headaches since 1985 but that Plaintiff had worked successfully for many years following the alleged onset of his headaches. (AR 15.)

The VA medical records are simply devoid of any objective indications of a persistent problem with headaches, despite Plaintiff's attempts to paint them as a persistent problem. Plaintiff is not required to go to the doctor each time he has a headache, but the evidence in this record does not demonstrate a medical condition of such severity that it could be expected to produce disabling pain. On the contrary, there are many instances in the record where Plaintiff or his doctors indicated that headaches were not a problem. (*See* AR 173 (October 10, 2001 treatment note by VA physician stating that Plaintiff's headaches were "infrequent and unlikely to be . . . disabling"); AR 314 (June 25, 2002 treatment note indicating Plaintiff reported no problems with headache despite headache diary entries to the contrary, *see supra* note 6); AR 336 (May 27, 2003 treatment note indicating Plaintiff reported no current problems with headaches); AR 333 (September 23, 2002 treatment note indicating no reported headache problems); and AR 328 (January 13, 2004 treatment note from one month before Plaintiff's administrative hearing, indicating headache symptoms "stable")).

Additionally, the ALJ reasonably found that there is little objective medical evidence supporting the alleged severity of the pseudogout in Plaintiff's left knee. It appeared to be well controlled with Lortab, other than occasional "flares," and Plaintiff did not demonstrate any significant worsening of the knee since 1995, at which time he was successfully performing work at the light level.

The ALJ engaged in a review of the medical record as a whole. His conclusion that Plaintiff's subjective complaints are not fully credible is supported by substantial evidence contained in the record. The ALJ did not err in evaluating Plaintiff's subjective complaints of pain.

> **2.** **The ALJ did not err in weighing the significance of the VA's disability rating upon the determination of disability under the Social Security Act.**

Plaintiff argues that the VA's 90% disability rating was "not given any weight," and should have factored more prominently in the ALJ's decision in the instant case with respect to Plaintiff's alleged disability under the Social Security Act. (Pl.'s Br. at 4.) Plaintiff claims that the ALJ "summarily dismissed" Plaintiff's 90% service-connected disability by stating that the SSA is not bound by the determination of another governmental agency. (Pl.'s Br. at 5.)

The ALJ correctly stated the law in noting that a determination made by another agency is not binding on the SSA, citing 20 C.F.R. § 404.1504. (AR 16.) Plaintiff quotes the same regulation in his own brief, but goes on to collect cases from other circuits, some of which suggest that a VA rating is entitled to "substantial" or "great" weight. (Pl.'s Br. at 4-5.) In the Sixth Circuit, however, courts have recognized that a VA disability determination is not binding, controlling, or conclusive in a Social Security disability benefits case, though it *may be* entitled to some weight. *See, e.g.*, *Hunley v. Cohen*, 288 F. Supp. 537 (E.D. Tenn. 1968) (stating that while the VA's rating of permanent and total disability must be considered, it is not controlling); *Payne v. Cohen*, 293 F. Supp. 48 (E.D. Ky. 1968) (plaintiff's award of a disability pension by the VA must be considered but is not controlling); *Patrick v. Finch*, 312 F. Supp. 121 (E.D. Ky. 1970) (grant of total disability by the VA "may" be considered but is not controlling); and *Williford v. Sec'y of Health & Human Servs.*, 550 F. Supp. 248 (S.D. Ohio 1982) (agreeing with the ALJ's observation that a disability finding by the VA or other government agency can be given some weight but is not dispositive of a Social Security claim). This Court has not discovered nor has either party cited a controlling case that stands for the proposition that a decision of the VA is entitled to substantial or great weight in the Sixth Circuit.

Moreover, the fact that the concepts of disability and procedures for determining disability under the Social Security Act are quite different from the rules and procedures adopted by the Veteran's Administration strongly supports a conclusion that a disability determination by the latter should not be

determinative of a disability determination pursuant to the former. Under the Social Security Act, for example, an individual is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other line of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In contrast, according to the November 12, 2002, Board of Veterans' Appeals decision contained in the Administrative Record in this case upholding Plaintiff's 90% disability rating, the Board found that Plaintiff's disabilities "precluded him from engaging in substantially gainful employment consistent with his education and occupational experience." (AR 52.)

The two agencies also have different definitions of the term "substantially gainful employment." The United States Court of Appeals for Veterans Claims defines it as "work which is more than marginal and permits the individual to earn a 'living wage.' The ability to work sporadically or obtain marginal employment is not substantially gainful employment." (AR 54, quoting *Moore v. Servinski*, 1 Vet. App. 356, 358 (1991).) By contrast, substantial gainful activity under the SSA can include part-time work and even illegal activity, including a drug addict's prostitution. *See Conn v. Sec'y of Health & Human Servs.*, 51 F.3d 607 (6th Cir. 1995); *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 246 (6th Cir. 1996). The pertinent consideration under the Social Security Act is whether the work in question results in earnings above the regulatory guidelines defining substantial gainful activity, and not the nature of the work itself or its relationship to the plaintiff's education or occupational experience. *See, e.g.*, *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1029 (6th Cir. 1990) (finding that work activity which results in earnings above the regulatory guidelines defining substantial gainful activity creates a presumption that a person is engaged in substantial gainful activity.)

Another pertinent difference between the two methodologies for evaluating disability hinges upon the weighing and reviewing of the evidence. The Social Security Administration has a very specific and involved five-step process for evaluating disability, and an equally involved process of reviewing those decisions, as outlined in this opinion. The VA, however, initially assigns its disability ratings according to whether a claimant meets certain criteria for the various levels of disability. Upon appellate review in this case, the Veterans' Appeals Board looked at the "overall evidence" and found that there was "an approximate balance of negative evidence with the positive evidence as to the underlying question of

whether the veteran is precluded from obtaining and retaining substantial gainful employment due to his . . . disabilities," and went on to state that in case of such a tie, the question must be resolved in the veteran's favor. (AR 58, quoting 38 U.S.C.A. § 5107(b).) Under the Social Security Act, a claimant's burden of proof is not so liberal.

Accordingly, the Court concludes that while an ALJ may, and in most circumstances should, *consider* a disability decision by the VA and give it such weight as the individual circumstances call for, the ALJ is not required to accord any particular level of deference to the decision of the VA or to reach the same conclusion with respect to the issue of disability. In this case, the ALJ clearly considered and weighed the previous disability determination rendered by the VA. The ALJ's nearly verbatim recitation of the controlling regulation should not be construed as "summarily dismiss[ing]" the VA's disability decision. In addition to a thorough review of the medical records provided by the VA over the lengthy course of Plaintiff's treatment history, the ALJ discussed Plaintiff's specific impairments and the percentage of disability assigned to them by the VA. He also cross-referenced the VA's conclusions with respect to disability with the contents of the medical records themselves, finding in some instances that the medical records did not objectively support a finding of disability despite the VA's opposite conclusion. (*See, e.g.*, AR 14-15.) In other words, the ALJ thoroughly considered the disability determination rendered by the VA but ultimately did not adopt the VA's findings. The ALJ clearly did not err in the degree of consideration he accorded the VA's prior decision nor in his rejection of it.

### 3. *The ALJ did not err in finding that Plaintiff's impairments, singly or in combination, did not meet or equal a listed impairment.*

Plaintiff argues that his headaches should be considered in combination with his degenerative disc disease and arthritis to medically equal one of the listed impairments. (Pl.'s Br. at 7.) The ALJ did not err in finding that these impairments did not meet or medically equal a listed impairment.

At the third step in the sequential evaluation process, the ALJ considers the medical severity of a plaintiff's impairments to determine whether those impairments meet both the duration requirements and the specific criteria contained in the listing of impairments in Appendix 1 of Subpart P ("the listings"). 20 C.F.R. § 404.1520(a)(4)(iii). Plaintiff has the burden of proving that his impairment is included in or equal in severity to those contained in the listings. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161,

164 (6th Cir. 1987). If a plaintiff's impairment meets or equals a listed impairment and meets the duration requirement, an automatic finding of disability results, without inquiry into Plaintiff's age, education, or work experience. 20 C.F.R. § 404.1520(d). Though the ALJ may make credibility assessments at steps four and five, determinations at step three must be made purely on the medical evidence. 20 C.F.R. § 404.1526(b). Medical evidence must be supported by acceptable clinical and diagnostic techniques, and must include a showing that all of the specified medical criteria are present. *See Dorton v. Heckler*, 789 F.2d 363, 366 (6th Cir. 1986), 20 C.F.R. § 416.925, *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990), *Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987).

Here, the ALJ specifically considered Plaintiff's physical and mental impairments (AR 16, applying criteria for mental impairments). Although the ALJ found that Plaintiff's degenerative disc disease and arthritis were severe impairments, he did not find that they were severe enough to meet or medically equal one of the impairments listed in the Appendix. The ALJ also found that although Plaintiff was treated for "pseudogout [sic] of the left knee, carpal tunnel syndrome, headaches, and anxiety/depression . . . these impairments, whether considered alone or in combination, do not have more than a minimal effect on the claimant's physical and/or mental ability to do basic work activity . . . " (AR 13.) Essentially, the ALJ found that Plaintiff's headaches were not a severe impairment, nor did they meet or equal a listing-level impairment even when considered in combination with Plaintiff's other impairments.

Plaintiff again attempts to rely upon the VA's disability rating as proof of disability, citing the VA's 50% disability rating for headaches and the fact that the VA attributed Plaintiff's headaches to neck pain caused by his disc disease or arthritis. (Pl.'s Br. at 7.) As previously indicated, the ALJ appropriately considered the VA's disability decision but did not err in independently reviewing the medical evidence of record and rejecting the VA's conclusions with respect to Plaintiff's headaches or their relationship to his other impairments.

For the foregoing reasons, the ALJ did not err with respect to evaluating whether Plaintiff met a listed impairment.

### 4. The ALJ did not err in assigning Plaintiff's Residual Functional Capacity.

Plaintiff objects to the ALJ's finding that Plaintiff retained the residual functional capacity to perform light work with limited overhead reaching. (Pl.'s Br. at 8.) Plaintiff argues that the ALJ should not

have relied upon the RFC assessment completed by Dr. Knox-Carter on August 29, 2002, that Plaintiff's knee and arthritis pain would preclude a finding that Plaintiff could perform the activities indicated in Dr. Knox-Carter's assessment, and that the ALJ failed to adequately explain why Plaintiff's testimony regarding his pain was not credited. (Pl.'s Br. at 8-9.)

First, with respect to Dr. Knox-Carter's assessment, Plaintiff asserts that it essentially described the "type of physical activity expected from an infantry soldier." Plaintiff argues that if he could perform the function of an infantry soldier, he would not have received a 90% disability rating from the VA. (Pl.'s Br. at 8.) Plaintiff's arguments on this point are without merit. First, the reference to an "infantry soldier" is misleading. The RFC assessment is a tool of the SSA and has nothing to do with assessing whether one can perform the duties of an infantry soldier, even if such an inquiry were relevant to this Plaintiff or to the question of disability. Plaintiff is again essentially attempting to rely upon the VA's assessment of his disability in order to establish his disability under the SSA, an argument already fully addressed and rejected earlier in this opinion. (*See supra* Part II.C(2).)

Dr. Knox-Carter based her conclusions on the medical evidence of record, and she provided specific examples of facts, test results, physical conditions, the results and findings of other examinations, and Plaintiff's "partially credible" allegations of pain in reaching her conclusions as to Plaintiff's RFC. (AR 274-79.) The objective medical evidence of record is in line with her findings. The ALJ properly relied upon the RFC assessment completed by Dr. Knox-Carter in assigning Plaintiff's RFC.

Plaintiff further argues that the ALJ failed to give reasons as to why Plaintiff's testimony regarding his limitations was "not credited." (Pl.'s Br. at 9.) As explained earlier in this opinion, the ALJ considered Plaintiff's allegations of pain and concluded that they were not fully credible; he did not, as Plaintiff suggests, reject them outright. In making that determination, the ALJ properly relied upon the medical evidence of record and explained his reasons as required by the relevant regulations and case law. The ALJ did not err in evaluating Plaintiff's allegations of pain in determining his RFC for light work. (*See supra* Part II.C(1).)

In sum, the ALJ's finding that Plaintiff can perform light work activity as described in his decision is supported by substantial evidence in the record and must be upheld.

5. **The ALJ did not err in finding that Plaintiff could perform his past relevant work.**

The ALJ's decision that Plaintiff was capable of performing his past relevant work was based in part on the VE's testimony at the February 2004 hearing. (AR 16-17.) Plaintiff argues that the ALJ erred in reaching that decision (Pl.'s Br. at 9), but Plaintiff's assertions of error are somewhat confusing due to a mistake on Plaintiff's part in attributing a January 28, 2002, written report prepared by Brantley B. Paget, a "vocational specialist," to the same VE that testified at the February 2004 hearing, Robert C. Bradley. (AR 96, 339.) The written report was not authored by the VE who testified at the February 2004 hearing. Therefore, the Court will not address Plaintiff's arguments regarding the VE's "written report," which is not the VE's written report at all, but actually a "Vocational Speci[a]list Comments" form prepared by an individual who was not the VE on whose testimony the ALJ relied. (AR 96.) Allegations that the VE did not rely upon accurate and complete information in preparing his report and purported discrepancies between the written report and the testimony at the hearing are therefore irrelevant. Further, the Court eschews further discussion of Plaintiff's contention that the VA's determination of unemployability due to service-connected disabilities has bearing on the VE's testimony or conclusions, as these arguments have been fully addressed earlier in this opinion.

All that remains, therefore, is Plaintiff's assertion that the ALJ could not expect Plaintiff to work an eight-hour day, five days a week, "if the ALJ accepted Plaintiff's testimony as truthful," based on the answer the VE gave to a question at the February 2004 hearing. (Pl.'s Br. at 9.) As a threshold matter, of course, the ALJ did not accept Plaintiff's testimony as completely truthful, as discussed above. Additionally, the ALJ need rely upon a VE's answer to a hypothetical question only if substantial evidence supports the assumptions included in the hypothetical question. *See Felisky* at 1036; *Hardaway v. Sec'y of Health and Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987); *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Further, a hypothetical question need not take into account a claimant's subjective complaints if the ALJ finds that those complaints are not credible. *See, e.g., Cline v. Shalala*, 96 F.3d 146, 150 (6th Cir. 1996).

In sum, the ALJ did not err in relying upon the hearing testimony of the VE regarding the classification of Plaintiff's former jobs, a point which Plaintiff does not dispute, nor did he err in finding that

Plaintiff could perform the past jobs which were consistent with Plaintiff's RFC.[11]  Plaintiff's final assertion of error is without merit.

**III.    CONCLUSION**

For all the reasons set forth above, the Court finds that the ALJ's decision as a whole is supported by substantial evidence in the record.  Plaintiff's motion for judgment on the record (Doc. No. 9) must therefore be denied and the Commissioner's decision affirmed.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge

---

[11] The ALJ did not find that Plaintiff could work as a painter or doing furniture repair, two of his other past jobs, presumably because the VE classified these jobs at the medium level.  (AR 354.)